# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CATHY CONN<br>4004 NORTH LONGVALLEY ROAD<br>HERNANDO, FLORIDA 34442<br><br>    Plaintiff,<br><br>v.<br><br>THE AMERICAN NATIONAL<br>RED CROSS<br>2025 E. STREET, N.W.<br>WASHINGTON, D.C. 20006<br><br>and<br><br>THE AMERICAN RED CROSS<br>BIOMEDICAL SERVICES<br>2025 E. STREET, N.W.<br>WASHINGTON, D.C. 20006<br><br>    Defendants.<br><br>SERVE:<br><br>Jeffrey W. Larocca, Esquire<br>Eckert Seamans Cherin & Mellot<br>1717 Pennsylvania Ave., N.W.<br>12th Floor<br>Washington, D.C. 20006 | Case No: 1:13-cv-1810 |

# **COMPLAINT**

This complaint seeks to remedy, pursuant to Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 ("ADA"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"), and the District of Columbia Human Rights Act, D.C. Code §§ 2-1401.01-2-1411.06, the illegal discriminatory conduct that the plaintiff, Cathy Conn, a sixty year old female, who suffers severe depression and anxiety which substantially impairs the major life activity of sleeping, endured when the American National Red Cross ("Red Cross") and the American Red Cross Biomedical Services ("Biomedical Services") suddenly terminated her on January 20, 2012.  On July 1, 2001, after an exemplary career at the United States Food and Drug Administration ("FDA") without any performance or disciplinary issues whatsoever, Ms. Conn joined the Red Cross and Biomedical Services as Director, Quality Audits.  From that day forward, Ms. Conn excelled as an employee.  She received only two performance appraisal ratings lower than "exceeds expectations," and those two rated Ms. Conn's performance as "meets expectations."  In addition, from the onset of her employment through August 1, 2011, Ms. Conn never was subject to any discipline or personnel actions whatsoever.  In fact, in 2011, Ms. Conn received an award for her superior performance.

Unfortunately for Ms. Conn, on August 1, 2011, the Red Cross promoted Thomas Manor to Vice President Compliance, Chief Compliance Officer, Biomedical Services, and he became Ms. Conn's direct supervisor.  Despite knowing that Ms. Conn was over forty years old and that she suffered from a disability, Mr. Manor, acting on behalf of the Red Cross, within six months of becoming Ms. Conn's supervisor, terminated Ms. Conn for alleged performance deficiencies and replaced her with a much younger, less qualified female.  The truth, however, is that the purported justifications for Ms. Conn's illegal and improper termination constitute pretexts simply designed to conceal the fact that the Red Cross and Biomedical Services illegally terminated Ms. Conn because of her disability and her age.  Simply put, Ms. Conn's performance at the Red Cross and Biomedical Services was never deficient.  She never committed any

offenses or violated any rules, regulations, or policies. The Red Cross' decision to terminate her was a feeble attempt to disguise the fact that the Red Cross and Biomedical Services desired to hire a younger, non-disabled female to replace Ms. Conn. Consequently, because of her illegal and improper termination, Ms. Conn initiates this lawsuit to hold the Red Cross accountable for its discriminatory conduct. This Court is the only forum where Ms. Conn will obtain a full and fair hearing regarding her claims.

## JURISDICTION

Since Ms. Conn initiates this lawsuit pursuant to the ADA and the ADEA, jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1331. *See* 28 U.S.C. § 1331; *see also* 42 U.S.C. § 2000e-5(f)(3). This Court possesses supplemental jurisdiction over Ms. Conn's state law claims. *See* 28 U.S.C. § 1367. Ms. Conn has also exhausted her administrative remedies. In March, 2012, Ms. Conn filed her charges of age and disability discrimination with respect to her January 20, 2012 illegal termination from the Red Cross and Biomedical Services with the Equal Employment Opportunity Commission ("EEOC"). By filing with the EEOC, Ms. Conn effectively filed with the District of Columbia Office of Human Rights ("DCOHR"), which has a worksharing agreement with the EEOC indicating that the DCOHR receives charges filed with the EEOC. On August 22, 2013, the EEOC mailed Ms. Conn a Dismissal and Notice of Rights Form ("Notice"), notifying her that the EEOC did not resolve Ms. Conn's discrimination claims on the merits, and that she had ninety days from receipt of the Notice to file a lawsuit in the appropriate federal district court. *See* Exhibits A and B, attached hereto and incorporated herein by reference. Ms. Conn filed this lawsuit within the ninety-day requisite time limit.

## VENUE

With respect to Ms. Conn's ADA claim, venue is proper in this district because the decision to terminate Ms. Conn occurred in the District of Columbia and the employment records relevant to Ms. Conn's termination are maintained and administered in the District of Columbia. *See* 42 U.S.C. § 12117(a)(venue for ADA claims governed by the factors identified in Title VII cases); *see also* 42 U.S.C. § 2000e-5(f)(3). Regarding Ms. Conn's ADEA claim, venue is proper in this district because the Red Cross and Biomedical Services reside in the District of Columbia, *i.e.*, they are subject to this Court's personal jurisdiction with respect to this dispute, and the critical event giving rise to this litigation, *i.e.*, the decision to terminate Ms. Conn occurred in the District of Columbia. *See* 28 U.S.C. § 1391(b)(1)-(b)(2).

## PARTIES

1. Plaintiff, Cathy Conn, is a sixty year old female who resides in Hernando, Florida. From July 1, 2001-January 20, 2012, Ms. Conn was an employee of the Red Cross and Biomedical Services, and served as Director, Quality Audits for the organization. While a national headquarters' employee, Ms. Conn was a teleworker whose primary work location was her Florida home but who travelled approximately 50% of the time to other locations.

2. Defendant, the American National Red Cross, is a nonprofit corporation organized by Congress located in the District of Columbia. The Red Cross employees more than 35,000 employees, and is engaged in an industry affecting commerce.

3. Defendant, American Red Cross Biomedical Services, is a division of the Red Cross, employs more than 10,000 of the more than 35,000 employees that the Red Cross employs, and is engaged in an industry affecting commerce.

## FACTUAL ALLEGATIONS

4.     In 1974, Ms. Conn graduated from West Virginia University with a degree in biology, and began work for Mylan Pharmaceuticals as a quality control chemist.

5.     In 1978, Ms. Conn returned to West Virginia University and, in 1980, received a degree in medical technology.

6.     From 1980-1985, Ms. Conn worked at West Virginia University Hospital as a medical technologist in the blood bank.

7.     In 1986, Ms. Conn started working at the Veterans Administration hospital in Altoona, Pennsylvania as a medical technologist.

8.     In 1987, Ms. Conn worked and studied at the National Institutes of Health in Bethesda, Maryland and became certified as a specialist in blood banking.

9.     In 1989, after working briefly for the Red Cross in Johnstown, Pennsylvania and the National Institutes of Health, Ms. Conn began working for the Food and Drug Administration ("FDA") as a consumer safety officer regulating biological products, including blood.

10.     In 1992, the FDA promoted Ms. Conn to Supervisory Consumer Safety Officer.

11.     During her tenure at the FDA, Ms. Conn performed in an exemplary fashion, was never subject to any discipline whatsoever, and received multiple awards, including an outstanding achievement award.

12.     In May 2000, because of her husband's retirement from the United States Department of Justice, Ms. Conn and her husband moved to Florida and she resigned from the FDA.

13.     In 2000, the Red Cross and Biomedical Services recruited Ms. Conn to become Director, Quality Audits and, initially, Ms. Conn became an independent contractor for the organization but, in 2001, the Red Cross converted her to a full-time employee.

14. As Director, Quality Audits, Ms. Conn supervised numerous employees, who were responsible for ensuring that the blood bank and the blood testing facilities throughout the United States complied with federal regulations regarding blood manufacturing.

15. In 2007, Ms. Conn was promoted to Senior Director, Quality Audits.

16. From 2001-2011, Ms. Conn's performance appraisals were always "meets expectations" and above. In fact, a vast majority of her performance evaluations were "exceeds expectations."

17. In 2011, the Red Cross awarded Ms. Conn the "Quality and Regulatory Affairs Red Ribbon Award" for her outstanding support to the Red Cross.

18. Prior to August 1, 2011, when Mr. Manor became her direct supervisor, Ms. Conn had numerous other supervisors and none of them ever imposed any disciplinary action whatsoever on Ms. Conn.

19. On August 1, 2011, Mr. Manor became Ms. Conn's direct supervisor and, sometime in August, in a phone conversation, Mr. Manor asked Ms. Conn when she was planning to retire.

20. Ms. Conn informed Mr. Manor that she would be eligible for retirement in three years, *i.e.*, she was 59 years old.

21. On September 15, 2011, after Mr. Manor became Ms. Conn's direct supervisor, he attended a staff meeting where he presented certain slides regarding the strategic plan for the Audit Department. One of the slides identified all of the Audit department employees and their respective training status.

22. After this staff meeting, Ms. Conn received at least four inquiries from her employees concerned about their job status. One of the employees questioned the accuracy of the slide concerning her training status.

23. Ms. Conn reviewed the slide, determined it was inaccurate, and informed her employees that she and her Co-Director, Winnie Dimmick, had no role in preparing the slide, and were not asked to review or correct the slide. In addition, Ms. Conn notified the employees that changes were coming, but there was nothing to be concerned about.

24. Ms. Conn did not copy this email to Mr. Manor, and there was no law, rule, regulation, or policy requiring her to do so.

25. Subsequent to the staff meeting and Ms. Conn's emailing her employees about the meeting, Mr. Manor telephonically contacted Ms. Conn, and asked if her employees had any concerns about the presentation.

26. Ms. Conn informed Mr. Manor that her employees were concerned about the inaccuracies contained on the training slide.

27. On September 30, despite her ten years of exemplary service and without any notice, including any verbal warning, Mr. Manor presented a "Final Written Warning" to Ms. Conn for undermining his leadership. According to Mr. Manor, the fact that Ms. Conn did not copy him with the email concerning the inaccuracies contained in the training slide "demonstrates a lack of support from you and calls into question your ability to manage and lead organizational change. It also raises questions about your ability to demonstrate adherence to core competencies such as ethics and integrity." *See* Exhibit C.

28. According to the Final Written Warning, Mr. Manor needed "to see evidence of [Ms. Conn's] leadership as a director, on my team, to adopt and support changes we will implement to increase the professionalism and effectiveness of our unit. This includes an absence of negativity and demonstrated actions of outward and inward support of our management direction. Issues and concerns must be surfaced in the appropriate management venue. Due to the lack of trust this email has created, effective immediately, you will need to copy me on all your staff communication, invite me to all staff meetings, and attach receipts for

any expenses incurred as a result of business travel.  Receipts will be required for reimbursement approval of all business travel no matter the dollar amount." *See* Exhibit C.

29. On October 3, 2011, Ms. Conn notified Mr. Manor of her depression/anxiety disability that had existed for many years and that, during the previous six years, Ms. Conn had been under a psychiatrist's treatment.

30. Beginning in at least approximately 2004-2005, Ms. Conn sought treatment for her depression/anxiety disorder.  She had been exhibiting symptoms for years prior to 2005, but did not seek treatment until approximately 2005.

31. Ms. Conn continues to be treated for her disability to the present day.

32. Psychiatrists prescribed anti-depressants, anti-anxiety, and sleeping medications, such as Cymbalta, Ativan, and Ambien, to alleviate her symptoms.

33. Her depression/anxiety disorder substantially limits at least one of Ms. Conn's major life activities; that is, because of the depression and anxiety from approximately 1997 forward, Ms. Conn suffered from—and continues to suffer from— longstanding periods of sleeplessness.

34. Ms. Conn would go several nights sleeping only two to four hours a night.

35. This periodic insomnia continues to the present day.  It is not a temporary condition and, unless Ms. Conn takes her sleeping medications, she is essentially up all night.

36. Ms. Conn's depression/anxiety disability substantially limits her sleeping activity compared to most people in the general population.

37. Despite this disability, as evidenced by her exemplary career with the Red Cross and Biomedical Services, Ms. Conn was qualified to perform the essential functions of her job as Co-director of Quality Audits with or without reasonable accommodations.

38. Subsequently, because the Final Written Warning letter exacerbated her disability, Ms. Conn took two weeks of personal time and then an additional four weeks of short term disability which the Red Cross and Biomedical Services approved.

39. On November 14, 2011, Ms. Conn returned to work, met with Mr. Manor and asked him to identify the requirements that she would have to fulfill to terminate the Final Written Warning letter's conditions. Mr. Manor did not identify any such requirements.

40. Ms. Conn, however, complied with the Final Written Warning's requirements. She met with Mr. Manor weekly to apprise him of the status of her projects, invited him to all staff meetings, held no meetings without inviting him, copied him on all pertinent emails, and provided him with the receipts relating to Ms. Conn's business travel.

41. At this same November 14, 2011 meeting, Mr. Manor informed Ms. Conn that Beverly Ruffin, an employee of Ms. Conn's, had submitted her retirement papers. This was the first time that anyone had notified Ms. Conn that Ms. Ruffin was retiring.

42. At the November 14, 2011 meeting, Mr. Manor provided no instructions to Ms. Conn regarding Ms. Ruffin's retirement.

43. In October, 2011, however, while Ms. Conn was on short-term disability leave, the Red Cross notified Mr. Manor that Ms. Ruffin had submitted her retirement papers and that Mr. Manor was required to accomplish certain tasks to finalize Ms. Ruffin's retirement.

44. On approximately December 13, 2011, Human Resources contacted Ms. Conn, informed her that Mr. Manor did not process Ms. Ruffin's retirement, and requested that Ms. Conn facilitate the retirement.

45. After Ms. Conn returned from her short-term disability leave, Mr. Manor altered Ms. Conn's job responsibilities and duties, removing from her duties that defined her job performance and responsibilities. Mr. Manor also excluded Ms. Conn from relevant meetings,

and informed her employees not to include Ms. Conn on various projects because Ms. Conn "would slow them down."

46. Around the Christmas holiday season, Mr. Manor was absent on leave for approximately three weeks.

47. On approximately January 18, 2011, Mr. Manor asked Ms. Conn to explain her actions with respect Ms. Ruffin's retirement.

48. Ms. Conn informed Mr. Manor that she reviewed the computer database, discovered that Ms. Ruffin was not listed as her employee, and therefore, could not process the retirement. Ms. Conn also informed Mr. Manor that she had contacted human resources and informed them that Ms. Ruffin was not listed as one of her employees and thus, Ms. Conn could not process her retirement.

49. On January 20, 2011, via telephone, the Red Cross terminated Ms. Conn ostensibly because the organization was not satisfied with her progress since the issuance of the Final Warning letter.

50. Since the issuance of the Final Warning letter, Ms. Conn had completed all tasks assigned by Mr. Manor, and he had never indicated he was dissatisfied with her progress.

51. To replace Ms. Conn as Director of Quality Audits, the Red Cross hired Suzanne Korreck, a much younger female with far less experience than Ms. Conn.

52. Ms. Korreck was also Mr. Manor's employee in his previous supervisory position with the Red Cross.

## COUNT I
### (Discriminatory Discharge Based Upon Disability in Violation of Title I of the Americans with Disabilities Act 42 U.S.C. §§ 12101-12213)

53. Paragraphs 1-52 are realleged and reincorporated herein by reference

54. Defendant's discharge of Ms. Conn in January, 2012 was improperly based upon Ms. Conn's depression/anxiety mental disability which substantially limited the significant life activity of sleeping.

55. Any purported justification for Ms. Conn's illegal and improper discharge was pretextual, designed to conceal the true discriminatory motive underlying her discharge.

56. As a direct cause of Defendant's discriminatory acts, Ms. Conn suffered and continues to suffer economic damages, emotional distress, and humiliation.

57. Defendant's discriminatory acts and intentions were malicious, and in willful, wanton or reckless disregard of Ms. Conn's rights.

## COUNT II
### (Discriminatory Discharge Based Upon Age in Violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623)

58. Paragraphs 1-57 are realleged and reincorporated herein by reference

59. Defendant's discharge of Ms. Conn was improperly based upon her age, *i.e.*, 59.

60. Ms. Conn's age played a role in the Defendant's decision to terminate her and had a determinative effect on the improper decision.

61. Any purported justification for Ms. Conn's illegal and improper termination was pretextual, designed to conceal the true discriminatory motive underlying her illegal and improper termination.

## COUNT III
### (Discriminatory Discharge Based Upon Disability In Violation of the District of Columbia Human Rights Act, D.C. Code § 2-1402.11)

62. Paragraphs1-61 are realleged and reincorporated herein by reference.

63. Defendant's discharge of Ms. Conn in January, 2012 was improperly based upon Ms. Conn's depression/anxiety mental disability which substantially limited the significant life activity of sleeping.

64. Any purported justification for Ms. Conn's illegal and improper discharge was pretextual, designed to conceal the true discriminatory motive underlying her discharge.

65. As a direct cause of Defendant's discriminatory acts, Ms. Conn suffered and continues to suffer economic damages, emotional distress, and humiliation.

66. Defendant's discriminatory acts and intentions were malicious, and in willful, wanton or reckless disregard of Ms. Conn's rights.

## COUNT IV
### (Discriminatory Discharge Based Upon Age In Violation of the District of Columbia Human Rights Act, D.C. Code § 2-1402.11)

67. Paragraphs 1-66 are realleged and reincorporated herein by reference.

68. Defendant's discharge of Ms. Conn was improperly based upon her age, i.e., 59.

69. Ms. Conn's age played a role in the Defendant's decision to terminate her and had a determinative effect on the improper decision.

70. Any purported justification for Ms. Conn's illegal and improper termination was pretextual, designed to conceal the true discriminatory motive underlying her illegal and improper termination.

71. Defendant's discriminatory acts and intentions were malicious, and in willful, wanton or reckless disregard of Ms. Conn's rights.

**WHEREFORE**, Plaintiff, Cathy Conn, prays for the following relief:

a) **As to Count I:**
   i. Reinstatement to her position as Director, Quality Audits
   ii. Backpay plus interest;
   iii. Compensatory damages in an amount to be determined;
   iv. Punitive damages in an amount to be determined;
   v. Reasonable Attorney Fees and Costs; and
   vi. Any and all other relief this Court deems just and equitable.

b) **As to Count II:**

   i. Reinstatement to her position as Director, Quality Audits;
   ii. Backpay plus interest;
   iii. Reasonable Attorney Fees and Costs; and
   iv. Any and all other relief this Court deems just and equitable.

c) **As to Count III:**

   i. Reinstatement to her position as Director, Quality Audits;
   ii. Backpay plus interest;
   iii. Reasonable attorney fees and costs; and
   iv. Any and all other relief this Court deems just and equitable.

d) **As to Count IV:**

   i. Reinstatement to her position as Director, Quality Audits;
   ii. Backpay plus interest;
   iii. Reasonable attorney fees and costs; and
   iv. Any and all other relief this Court deems just and equitable.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial of all issues so triable.

Respectfully submitted this 19th day of November, 2011.

        LAW OFFICE OF ROSS A. NABATOFF

By:   /s/Ross A. Nabatoff
       Ross A. Nabatoff, DC Bar # 376665
       1875 Eye Street, N.W.
       Washington, D.C.  20006
       (202) 650-0037

       Attorney for Plaintiff
       Cathy Conn