# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CATHY CONN**, | |
| Plaintiff, | |
| v. | Case No. 13-cv-01810 (CRC) |
| **AMERICAN NATIONAL RED CROSS**, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Cathy Conn was warned for undermining the leadership of her newly installed supervisor at the American Red Cross, and then terminated several months later for failing to heed the warning and several other purported transgressions. Believing she was actually fired because of her age and disability—she was 59 years old and suffered from depression, anxiety, and insomnia at the time— Conn filed this suit. Before the Court are three motions by the Red Cross: a motion for summary judgment on all aspects of liability; a motion for summary judgment on certain issues of damages; and, should the Court deny summary judgment on liability, a motion for a bench trial on the ground that the Red Cross's status as a federally chartered instrumentality immunizes it from trial by jury.

Finding that Conn has offered sufficient evidence to support a finding that the Red Cross's proffered reasons for her termination were pretexts for age and disability discrimination, the Court will deny the Red Cross's summary judgment motion on Conn's claims under the federal Age Discrimination in Employment Act ("ADEA") and the Americans with Disabilities Act ("ADA"). But because Conn has failed to establish that any conduct surrounding her termination occurred in the nation's capital, it will grant summary judgment in favor of the Red Cross on Conn's claims under the District of Columbia Human Rights Act.

As for damages, the Court agrees with the Red Cross that any back-pay Conn is awarded should be reduced by the income she received from an ancillary business, and that Conn is not entitled to recover pension benefits accruing after the Red Cross's retirement system closed on December 31, 2012, lost interest income, life-insurance benefits, or living expenses above and beyond any award of back-pay.  The Court will therefore grant summary judgment to the Red Cross on those damages issues.  A genuine issue of material fact exists, however, as to whether Conn mitigated her damages by making the required good-faith effort to obtain substitute employment after she was terminated, and the Court agrees with Conn that it has the authority to award back-pay without offsetting that amount with unemployment-insurance benefits.  The Court will thus deny summary judgment to the Red Cross on those issues.

Finally, the Court reserves judgment and will issue a separate opinion as to the following issues: (1) whether Congress has waived the Red Cross's sovereign immunity with respect to punitive damages under the ADA and liquidated damages under the ADEA, and (2) whether Congress has waived the Red Cross's sovereign immunity with respect to jury trials under both statutes.  It will therefore defer ruling on the remainder of the Red Cross's motion for partial summary judgment on damages and on its motion for a bench trial.

## I.     Background

Cathy Conn worked for the Red Cross for over ten years, primarily as a director of the audit department responsible for ensuring that the Red Cross's blood bank and blood-testing facilities comply with federal regulations.  See Def.'s Mem. Supp. Mot. Summ. J. Liability ("MSJL") 2. Conn supervised between eight and fourteen auditors.  Id.  In August 2011, the Red Cross created the position of chief compliance officer to oversee Conn's department, and hired Thomas Manor for the job.  Id. at 2–3.  Things did not go smoothly.  Both sides agree that Conn "had issues with Manor's management style."  Pl.'s Opp'n Def.'s MSJL 5; Def.'s Mem. Supp. MSJL 3.  But while

Conn claims she was a team player, the Red Cross insists that she openly resisted Manor's authority from the beginning.  In either event, the relationship between the two soured in September 2011, only a month or so after Manor arrived, following a presentation by Manor to the auditing staff outlining his vision for the department.  Def.'s Mem. Supp. MSJL 4–6.  According to Conn, multiple members of the staff voiced concerns about what they perceived as inaccuracies in the presentation slides.  Pl.'s Opp'n Def.'s MSJL 7.  In response to these concerns, Conn sent a "confidential" email to all of the auditors—without copying Manor—advising them to take certain of the slides "with a grain of salt" and clarifying that she "had no input" on the presentation.  Def.'s Mem. Supp. MSJL 5.  When Manor became aware of the email and asked Conn about the staff's reaction to the presentation, Conn conveyed their concerns but failed to mention having sent the email.  Id. at 5–6.

Following this incident, on September 30, 2011, Manor issued Conn a "final written warning" letter for "undermining [his] leadership."  Def.'s MSJL Ex. 9.  Manor wrote that Conn's all-staff email exhibited "a lack of support" and raised questions about her management abilities, as well as her "ethics and integrity."  Id.  Manor admonished Conn to conduct herself professionally and with an "absence of negativity" and directed her to, among other things, "copy me on your all staff communication" and "invite me to all staff meetings."  Id.

The next business day, Conn notified Manor in an email that she had "been under a psychiatrist's care for the past 6 years due to job related stress and anxiety" and that the final written warning had "exacerbated [her] condition to the point where" she was "heavily medicated and not able to travel or work."  Id. Ex. 13.  Conn subsequently applied for approximately five weeks of leave under the Family and Medical Leave Act ("FMLA") due to "poor focus, distract[ibility], [and] anxiety."  Id. Ex. 14.  On her application, which was approved and signed on Manor's behalf by another employee, Conn indicated that she had "a serious health condition that

3

makes me unable to perform the essential functions of my job."  Pl.'s Opp'n Def.'s MSJL Ex. G.

Conn claims that after she returned from leave, in November 2011, Manor proceeded to "strip[]

[her] of her original job functions," Pl.'s Opp'n Def.'s MSJL 9, and "informed other employees that

she would slow them down," id. at 3.

On January 16, 2012, Conn emailed Manor and her co-director in the auditing department,

Winnie Dimmick, concerning Kristine Bevan, Manor's executive assistant.  Complaining about

Bevan's interactions with the auditing staff, Conn wrote that "[Kristine] has insulted Winnie and

[me] on multiple occasions.  Perhaps a final written warning letter is warranted since her letter is

undermining your leadership with the staff?!"  Def.'s Mem. Supp. MSJL Ex. 17.

Three days after this incident, on January 19, 2012, Manor prepared a memorandum

requesting approval to terminate Conn.  Id. Ex. 16.  In the memorandum, Manor offered four

reasons in support of his termination request: (1) the January 16 email about Kristine Bevan, which

Manor took to be a violation of his admonition in Conn's final written warning to act professionally

and with an "absence of negativity"; (2) Conn's failure to copy him on all of her email

communications to her staff; (3) her failure to accurately complete the processing of retirement

paperwork for another employee, which Manor had asked her to do; and (4) Conn's distribution of

multiple incorrect versions of a document discussing department goals.  Def.'s Mem. Supp. MSJL

Ex. 15.  The Red Cross's Human Resources Director approved Conn's termination, which took

effect on January 20, 2012.

Conn then timely filed a charge of discrimination with the Equal Employment Opportunity

Commission on March 19, 2012, was issued a right-to-sue letter by the agency on August 22, 2013,

and filed suit in this Court on November 19, 2013.  Compl. 2; id. Exs. 1, 2.  The Court held a

hearing on the Red Cross's summary judgment motions on December 14, 2015.

## II.     Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the burden to demonstrate the "absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To overcome a motion for summary judgment, the non-moving party must "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). A dispute is genuine only if a reasonable fact-finder could find for the non-moving party; a fact is material only if it is capable of affecting the outcome of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Laningham v. U.S. Dep't of Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" Scott v. Harris, 550 U.S. 372, 378 (2007) (alteration in original) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).

## III.    Analysis

The Red Cross has filed a motion for summary judgment on liability as to all of Conn's claims, which she brings under the ADEA, the ADA, and the DCHRA; a motion for partial summary judgment on damages, which addresses Conn's mitigation of salary- and benefits-related damages, the availability of punitive damages under the ADA and liquidated damages under the ADEA, the availability of compensatory and punitive damages under the ADEA, and Conn's living expenses; and a motion for a bench trial. The Court will address the liability and most of the damages issues but reserve judgment on the availability of punitive damages under the ADA and

liquidated damages under the ADEA, as well as Conn's right to a jury trial against the Red Cross, until a later date.

A.   Motion for Summary Judgment on Liability

The Age Discrimination in Employment Act ("ADEA") prohibits employers from "discharg[ing] an[] individual . . . because of such individual's age." 29 U.S.C. § 623. Similarly, the Americans with Disabilities Act ("ADA") prohibits employers from discharging "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Conn charges the Red Cross with violations of both of these acts.[1] To succeed on her ADEA claim, Conn ultimately "must prove that age was the 'but-for' cause of [her] employer's adverse decision." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009). Although the D.C. Circuit has not spoken directly to the issue, other circuit courts to have considered the issue in light of Gross have concluded that both the ADEA *and* the ADA "prohibit discrimination that is a 'but-for cause of the employer's adverse decision.' The same standard applies to both laws." Lewis v. Humboldt Acquisition Corp., 681 F.3d 312, 321 (6th Cir. 2012) (en banc) (quoting Gross, 557 U.S. at 176); see also Serwatka v. Rockwell Automation, Inc., 591 F.3d 957, 962 (7th Cir. 2010) ("[A] plaintiff complaining of discriminatory discharge under the ADA must show that his or her employer would not have fired him but for his actual or perceived disability; proof of mixed motives will not suffice."). This Court will apply "the same standard . . . to both laws." Lewis, 681 F.3d at 321. But see Drasek v. Burwell, No. 13-CV-0847

---

[1] As noted, Conn also charges the Red Cross with violating the District of Columbia Human Rights Act. The Court "analyze[s] discrimination claims under the D.C. Human Rights Act in the same way that [it] analyze[s] discrimination claims under the federal anti-discrimination laws," including the ADEA and ADA. Vatel v. Alliance of Auto. Mfrs., 627 F.3d 1245, 1246 (D.C. Cir. 2011); see also Giles v. Transit Employees Fed. Credit Union, 794 F.3d 1, 5 (D.C. Cir. 2015) ("When evaluating claims brought under the DCHRA, 'decisions construing the ADA [are considered] persuasive.'" (quoting Grant v. May Dep't Stores Co., 786 A.2d 580, 583–84 (D.C. 2001))).

(KBJ), 2015 WL 4910499, at *7 (D.D.C. Aug. 17, 2015) (holding that "a [disability] discrimination . . . claim brought under the ADA can rest on a 'motivating factor' causation analysis—meaning that the claim can be sustained if discriminatory animus is merely one of several factors that precipitated the adverse employment action").

Courts analyze both statutes under the familiar McDonnell-Douglas framework, which first requires the plaintiff to make out a *prima facie* case of discrimination.  Hall v. Giant Food, Inc., 175 F.3d 1074, 1077 (D.C. Cir. 1999); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998). In the age-discrimination context, making out a *prima facie* case entails "show[ing] that [the plaintiff] belongs in the statutorily protected age group, [s]he was qualified for the position, [s]he was terminated, and [s]he was disadvantaged in favor of a younger person."  Hall, 175 F.3d at 1077. As relevant here, in the disability-discrimination context, an employee makes out a *prima facie* case in a similar way, but puts forward evidence showing that she is disabled under the ADA—meaning that she has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(a).  After the plaintiff makes out her *prima facie* case, the burden then switches to the defendant to show that there was a lawful reason for the employment action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  If the defendant does so, then the question on summary judgment becomes whether, based on the totality of the parties' evidence, a reasonable jury could determine that the defendant's proffered explanation was pretext for discrimination.[2]  Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494–95 (D.C. Cir. 2008).  In other words,

> [T]he focus of proceedings at trial (and at summary judgment) [should] be on whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima*

---

[2] The Court's use of the term "reasonable jury" should not be taken to presage its decision on the Red Cross's pending motion to hold a bench trial in place of a jury trial.  The more familiar reasonable-jury standard would still apply in the event of a bench trial because "the law of summary

*facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . .

Aka, 156 F.3d at 1289.  Where, as here, "an employer offers 'clear and reasonably specific' nondiscriminatory reasons for the adverse employment action," Royall v. Nat'l Ass'n of Letter Carriers, 548 F.3d 137, 144 (D.C. Cir. 2008) (quoting Tex. Dep't of Community Affairs v. Burdine, 450 U.S. 248, 258 (1981), "the court need not decide whether the plaintiff has made out a prima facie case, and [should] 'proceed [directly] to the ultimate question of discrimination *vel non*,'" id. (quoting George v. Leavitt, 407 F.3d 405, 411 (D.C. Cir. 2005)).

1.    The Red Cross's Proffered Reasons for Terminating Conn

Applying McDonnell-Douglas's burden-shifting framework, the Court makes two determinations: whether the Red Cross's proffered reasons for Conn's termination are legitimate and non-discriminatory, and, if they are, whether Conn has produced sufficient evidence for a reasonable jury to conclude that those legitimate reasons were in fact pretexts for discrimination.  In undertaking this inquiry, the Court is mindful that "there are 'instances where, although the plaintiff has . . . set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.'"  Giles, 794 F.3d at 9 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000)).  In such situations, summary judgment for the defendant would be proper.  See id.

The Red Cross maintains that its decision to terminate Conn is amply supported by the four reasons cited in Manor's termination memorandum.  First, the Red Cross points to Conn's email to Manor complaining about Kristine Bevan, Manor's executive assistant, in which Conn wrote,

---

judgment does not vary with this circumstance."  Farmland Indus., Inc. v. Grain Bd. of Iraq, 904 F.2d 732, 738 (D.C. Cir. 1990).

"Perhaps a final written warning letter is warranted since her letter is undermining your leadership with the staff!?"  Def.'s MSJL Ex. 17.  According to the Red Cross,

> Manor understood Conn's e-mail to be a sarcastic and unprofessional reference to the final written warning letter he had issued to Conn because Bevan did not report to Conn and, if Conn wanted to make a serious request for an employee outside of her reporting chain to be disciplined, Manor expected her to do so in a one-on-one discussion rather than in a flippant e-mail copied to a third person who also was not in the employee's reporting chain.

Def.'s Mem. Supp. MSJL 8 (citing id. Ex. 2 at 105:2–108:17).  Conn contests Manor's characterization of the email as negative and "snarky."  Pl.'s Opp'n Def.'s MSJL 27.  But the email speaks for itself.  It clearly was a sarcastic reference to the final written warning she had received.  It can also be reasonably read to violate the admonition in Conn's final written warning to act with "an absence of negativity."  Def.'s Mem. Supp. MSJL Ex. 9.  The email thus constitutes a legitimate, non-discriminatory reason supporting Conn's termination.

The same cannot be said of the second reason Manor offered for terminating Conn.  The Red Cross cites multiple emails that Conn sent to various staff members without copying Manor, an action which it contends violated Manor's directive to copy him "on all of her communications with her staff following the final written warning letter."  Id.  Conn's actions in this regard might seem to constitute insubordination, but for the fact that Manor *never requested* that Conn copy him on "all of her communications with staff."  Id.  Rather, Manor—in the final written warning letter—instructed Conn, "[C]opy me on your *all staff* communication," id. Ex. 9 (emphasis added), not all of her staff communication.  The Red Cross chalks this confusion up to a typographical error, insisting that Manor made a "reasonable mistake" when he reversed the words "all" and "your."  Def.'s Reply Supp. MSJL 21.  But that does not change the fact that Conn indisputably complied with the literal directive in her final written warning: to copy Manor on her all-staff communication.  Conn's failure to copy Manor on emails to some individual staff members—which in and of itself

does not violate any Red Cross policy—therefore cannot constitute a legitimate reason for terminating her employment.  And the fact that Manor included this reason as part of the rationale for his decision to terminate Conn certainly bolsters her claim of pretext.

Third, the Red Cross points to Conn's failure to follow up with Human Resources to ensure that the retirement of another employee was processed successfully, thereby causing the co-worker to miss her first pension payment.  Id.  Conn responds that she faced technical difficulties in processing the retirement paperwork and therefore was "disciplined for failing to perform a task that [she] literally could not complete."  Pl.'s Opp'n Def.'s MSJL 29 n.16.  Manor's termination memorandum makes clear, however, that Conn's transgression was not simply her failure to process the other employee's retirement paperwork, but her failure, upon encountering technical difficulties, to "follow[] up when she did not receive a response" from Human Resources rather than "assume[] that someone [else] had performed the . . . task."  Def.'s Mem. Supp. MSJL Ex. 15.  Especially given that the co-worker missed her first pension payment as a result of Conn's action—or inaction—there appears to be nothing illegitimate about basing an employee's termination, at least in part, on this reason.

Conn protests that Manor was initially tasked with that assignment, never completed it, and was not disciplined; by contrast, Conn alleges, she attempted to complete the task, was unable to do so because of technical issues, yet was terminated.  "Such a scenario," she contends, "smacks of pretext."  Pl.'s Opp'n Def.'s MSJL 29.  The Red Cross offers a facially sensible explanation for this distinction: "Human [R]esources only asked Manor to process [the employee's] retirement because Conn was out on leave. . . .When Conn returned to work, the task was not yet complete and human resources reassigned it to Conn."  Def.'s Reply Supp. MSJL 22.  Yet the fact that both Manor and Conn were at one point tasked with processing the retirement paperwork, that evidently neither followed up to ensure that the retirement paperwork was successfully processed, and that

only Conn faced disciplinary repercussions could potentially lead a reasonable jury to conclude that this otherwise-legitimate reason for Conn's termination was pretextual.

Fourth, the Red Cross claims that Conn repeatedly sent auditors in her department incorrect versions of a document outlining department goals and "eventually instructed the auditors to open a draft version which highlighted the specific revisions made by Manor and 'accept' the changes themselves using word processing software." Def.'s Mem. Supp. MSJL 9. In Manor's view, "[t]his string of events demonstrate[d] [Conn's] inability to effectively execute as a director." Id. Ex. 15. This too appears to be a legitimate, non-discriminatory reason supporting Conn's termination, especially because the incorrect versions that Conn distributed apparently revealed differences of opinion between Conn and Manor that should not have been shared with staff. See Def.'s Mem. Supp. MSJL 9.

Conn insists that Manor has done the same thing himself (and was not disciplined), and cites testimony from the Red Cross's Vice President for Human Resources indicating that, as far as he knows, no one else at the Red Cross has been disciplined—much less fired—for distributing incorrect versions of documents. Pl.'s Opp'n Def.'s MSJL Ex. C (Dep. of Keith Sherman) 69:16– 70:11. If a jury credits this testimony and finds that other Red Cross employees have not been disciplined for similar conduct, it could conclude that justifying Conn's termination in part based on this kind of technical mishap was pretextual.

Conn also contends that the manner of her termination raises other red flags that are indicative of pretext. "An employer's failure to follow its own procedures in terminating an employee may be probative evidence of pretext." See Johnson v. District of Columbia, 99 F. Supp. 3d 100, 106 (D.D.C. 2015). Conn first points to what she alleges are irregularities in the process by which she was terminated. For one, she asserts that she had not been subject to any discipline by the Red Cross prior to receiving her final written warning, and she offers testimony from Dimmick

11

that "she had never seen an employee given a final written warning letter without having some prior discipline." Pl.'s Opp'n Def.'s MSJL 26 n.11. It is unclear what firsthand knowledge Dimmick would have of such a practice, but if it is in fact the Red Cross's practice never to issue final written warning letters to employees who have no prior disciplinary record, then Conn's case might be an anomaly. Conn also claims that Manor violated the Red Cross's disciplinary policies by failing to consult with both the Human Resources department and the Equal Employment Opportunity office prior to issuing Conn's final written warning. The record remains unclear as to whether the Red Cross wholly complied with the policy. The Court disagrees with Conn that there is no dispute as to this point, but acknowledges that some uncertainty exists as to whether the Red Cross fully complied with its own procedures in disciplining and terminating Conn.

Taken together, the weaknesses in several of the reasons that the Red Cross offers for Conn's termination and the potential anomalies in the process by which she was terminated could allow a reasonable jury to conclude that the reasons given were pretextual. Mere evidence of pretext, though, is insufficient to survive a motion for summary judgment, because even in instances where a plaintiff has provided enough evidence to reject the defendant's explanation, she still must produce evidence that would allow a rational factfinder to conclude that her termination was made for discriminatory reasons. Giles, 794 F.3d at 9. The Court therefore turns to Conn's evidence of discrimination.

### 2.    Evidence of Age Discrimination

Conn points to three alleged remarks by Manor as evidence that she was terminated because of her age. First, a few weeks after he was hired, Manor held a telephone conference with Conn and Dimmick concerning their professional-development goals. According to both employees, Manor asked them during the call "when they planned to retire." Pl.'s Opp'n Def.'s MSJL 19. (Dimmick testified that Manor also asked their ages, although Conn did not recall that in her

deposition.)  Second, Dimmick testified in her deposition that Manor told her that she and Conn "had been in [their] jobs too long to accept change."  Pl.'s Opp'n Def.'s MSJL Ex. A, at 43:21–44:14.  And third, Dimmick testified that, prior to Conn's return from leave, Manor suggested that Conn would "slow us down" were she to be reassigned the tasks she had previously handled.  Id. at 121:8-16.  Conn contends that Manor's alleged statements are both direct *and* indirect evidence of discriminatory intent on the part of Manor.[3]

Manor's alleged comments are not direct evidence of discrimination.  To qualify as direct evidence, a statement or remark must "*itself* show[] . . . bias in the employment decision."  Wilson v. Cox, 753 F.3d 244, 247 (D.C. Cir. 2014) (quoting Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 576 (D.C. Cir. 2013) (per curiam)); see also Daniel v. Johns Hopkins Univ., No. CV 14-87 (RCL), 2015 WL 4611525, at *2 (D.D.C. July 31, 2015) (direct evidence of discrimination may include a "statement or written document showing discriminatory motive [for terminating the employee] on its face" (quoting Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 86 (D.D.C. 2006)).  In other words, there must be an "evident connection" "between the remark and the adverse employment decision" for the remark to be considered direct evidence.  Beeck v. Fed. Exp. Corp., 81 F. Supp. 2d 48, 54 (D.D.C. 2000).  No such connection has been shown here.  Manor did not make any of the remarks in connection with his decision to terminate Conn.  His question about when Conn and Dimmick planned to retire arose in an entirely different context—during a conversation about professional development—some three months before Conn's termination.

_____

[3] Conn also cites the uncontested fact that she was replaced by a younger person as direct evidence of discrimination.  The D.C. Circuit has made clear, however, that "the mere fact that an older employee is replaced by a younger one does not permit an inference that the replacement was motivated by age discrimination."  La Montagne v. Am. Convenience Prods., Inc., 750 F.2d 1405, 1413 (D.C. Cir. 1984).  Conn's replacement by a younger employee is more appropriately considered as an element of her *prima facie* case of discrimination.

Although the record is not entirely clear, the same appears to be true of Manor's purported comment about Conn and Dimmick having been in their jobs too long to accept change: Dimmick said it took place during the professional-development call, while Conn could not pinpoint it at all. And Manor's statement that Conn will "slow us down" arose during a discussion of Conn's assignments upon her return from leave, again well prior to her termination.

At most, then, the statements attributed to Manor could be indirect evidence of age discrimination. Unlike direct evidence, indirect evidence does not require an expression of bias on the face the statement. Discrimination must instead be *inferred* from the statement based on what was said and the surrounding circumstances.

Manor's question regarding Conn's retirement plans, viewed alone and solely in the context in which it was made, cannot support a discriminatory inference. It would be perfectly natural, in the Court's view, for a newly installed supervisor, in the course of discussing a senior staff member's career-development goals, to inquire as to her age and retirement plans. No pejorative connotation can reasonably be drawn from the question in that setting. Not so, however, for Manor's other alleged remarks. The comments that Conn "had been in her job too long to adapt to change" and "would slow us down" if given back her former assignments may well have been innocuous, as the Red Cross claims. But they could also reflect "the sort of 'inaccurate and stigmatizing stereotypes' that led Congress to enact the ADEA." Wilson, 753 F.3d at 247–48 (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)) (finding a supervisor's remarks that older workers "didn't come here to work, [they] came here to retire" and were occasionally found asleep constituted evidence of age-based employment discrimination). That is, a reasonable factfinder could conclude from these statements that Manor viewed older workers like Conn as resistant to change and inefficient due to their age and that these views led to his decision to terminate her. That can be enough to permit an inference of age-based bias.

The circumstances surrounding Manor's statements lend further support to such an inference. Cf. Thomas v. Gandhi, 650 F. Supp. 2d 35, 40 (D.D.C. 2009), aff'd, 377 F. App'x 25 (D.C. Cir. 2010) ("[C]ourts do not look at such statements in isolation, but rather in light of the context in which they were made."). As discussed previously, Conn has presented "pretext" evidence challenging the legitimacy of at least some of the reasons that Manor offered for her termination and the process used to effectuate it. The relatively short period of time during which Manor supervised Conn before issuing her final warning and then terminating her also raises questions concerning Manor's motivations. Viewed against the entirety of Conn's and Manor's relationship, and in the light most favorable to Conn, the Court concludes that Manor's comments could support a reasonable inference that he terminated Conn because of her age. Thus, the Court will deny the Red Cross summary judgment as to Conn's ADEA claim.

### 3.   Evidence of Disability Discrimination

Before turning to Conn's evidence of disability discrimination, the Court must resolve two threshold questions that the Red Cross has raised in opposition to Conn's claim: first, whether Conn suffers from a disability within the meaning of the ADA and, second, whether Manor was aware of any such disability.

### a.   Whether Conn is Disabled

A person is disabled within the meaning of the ADA when, as relevant here, she has "a physical or mental impairment that substantially limits one or more [of her] major life activities." 42 U.S.C. § 12102(1)(A). Conn claims that she is disabled under this definition because she suffers from depression and anxiety, which she contends substantially interfere with her ability to sleep. It is undisputed that Conn suffers from depression and anxiety, that these disorders qualify as mental impairments, that they caused at least some disruption to Conn's sleep, and that sleeping constitutes a major life activity. The only open question is whether Conn's mental impairments "substantially

limit[ed]" her ability to sleep.  Importantly, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active," and "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication."  42 U.S.C. § 12102(4)(D)–(E).

To demonstrate that a mental impairment substantially limits a major life activity, "plaintiffs must show that their limitation [is] substantial 'as compared to the average person in the general population,'" Desmond v. Mukasey, 530 F.3d 944, 955 (D.C. Cir. 2008) (quoting Singh v. George Washington Univ. Sch. of Med., 508 F.3d 1097, 1100–04 (D.C. Cir. 2007)), although "it may be more appropriate in some situations to set the benchmark against the individual's experience prior to becoming impaired, or perhaps upon some combination of the individual's and the average person's experience," id. at 955–56.  When a plaintiff alleges a substantial limitation on her ability to sleep, she must "offer more than generalized allegations of restless or fitful sleep, or occasional, temporary bouts of sleeplessness."  Desmond, 530 F.3d at 956.

The evidence Conn proffers to establish that she suffers from a substantial limitation on her ability to sleep centers on her history of insomnia.  She testified that she began experiencing problems with sleeplessness in 1997, Pl.'s Opp'n Def.'s MSJL Ex. E (Dep. of Cathy Conn) 67:16-19, which is corroborated by her husband and her current and former psychiatrists.  Id. Ex. Y (Dep. of James Conn); id. Ex. CC (Dep. of Dr. John Grace) 12:24–13:4; id. Ex. AA (Dep. of Dr. Leo Yason) 15:9-14.  As a result of her insomnia, Conn asserts, she experienced trouble sleeping approximately two nights per week around the time she was terminated, and on those nights she would typically sleep for around four hours.  Def.'s MSJL Ex. 1 (Dep. of Cathy Conn) 113:15-21.  The Red Cross counters that any limitation on Conn's ability to sleep was not substantial because

"unrebutted evidence [shows] that [Conn] was sleeping well without medication but had difficulty sleeping more than four hours a couple times a week."  Def.'s Reply Supp. MSJL 23.

 The evidence is far from one-sided, however.  As the Red Cross implicitly recognizes, the relevant question is not how much sleep Conn was actually receiving in the months leading up to her termination, but rather to what degree her ability to sleep would be limited in the absence of "mitigating measures . . . such as medication."[4]  42 U.S.C. § 12102(4)(E)(i).  Conn testified that she is able to sleep "*with Ambien*," a prescription sleep aid, Pl.'s Opp'n Def.'s MSJL Ex. E, at 68:8 (emphasis added), which she says she continues to take, id. at 67:9-10, clearly implying that her sleep would suffer without it.  If indeed Conn could sleep only because of medication, then her ability to sleep may still have been substantially limited within the meaning of the ADA even if the amount of sleep she actually got did not vary dramatically from that of the average person in the population.  See 42 U.S.C. § 12102(4)(E)(i).  The Red Cross may challenge Conn's evidence with the testimony of Conn's former psychiatrist, Dr. Yason, that Conn was sleeping well *without* taking medication regularly, see Yason Dep. 27:9–28:4, which would indicate that Conn's mental impairments did not significantly impair her ability to sleep regardless of mitigation.  But, based on her testimony, a reasonable factfinder could still believe she was only sleeping as well as she did because of medication.

---

 [4] In the fall of 2008, after the D.C. Circuit had decided Desmond, Congress amended the ADA to "reject the requirement enunciated by the Supreme Court in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) and its companion cases that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures."  ADA Amendments Act of 2008, Pub. L. 110–325, Sept. 25, 2008, 122 Stat. 3553. Under this amendment, "[t]he determination of whether an impairment substantially limits a major life activity shall be made *without* regard to the ameliorative effects of mitigating measures such as . . . medication."  42 U.S.C. § 12102(4)(E)(i) (emphasis added).

Even if a jury believes that Conn was *not* taking medication, an issue of fact would still exist as to whether getting as little as four hours of sleep two nights per week constitutes a substantial limitation. The D.C. Circuit has wrestled with the question of when limitations on a person's ability to sleep qualify as substantial. In Desmond, the Court held that a reasonable jury could conclude that a person getting two to four hours of sleep per night for five months experienced a substantial limitation. 530 F.3d at 957. It did not, however, purport to set a ceiling on how much sleep a person could get and still be substantially limited in her ability to do so. Rather, it emphasized that "the only question is what a reasonable jury could conclude" as to whether or not a person's "sleep difficulties amounted to nothing more than those commonly experienced." Id. Undoubtedly many Americans contend with problems sleeping more severe than what Conn has testified to experiencing, but this Court is not in the position to decide, as a matter of law, that a person who is able to sleep only four hours per night on two nights each week is not substantially limited in her ability to sleep. The question of whether a plaintiff's ability to sleep is substantially limited is ultimately a question of fact, and "borderline cases like this turn on fact questions best left to juries rather than to judges ruling on summary judgment." Id. at 957.

### b. Whether Manor Was Aware of Conn's Disability

The Red Cross argues that Manor did not have enough information to know or even suspect that Conn was disabled and that therefore "he could not possibly have harbored discriminatory animus based on a disability." Def.'s Reply Supp. MSJL 24. Manor's knowledge in this regard is relevant, of course, because "an employer cannot fire an employee 'because of' a disability unless it knows of the disability." Hedberg v. Ind. Bell Tel. Co., 47 F.3d 928, 932 (7th Cir. 1995). Conn responds that Manor was aware of her disability because he signed off on her FMLA application, which indicated that she had "a serious health condition that makes [her] unable to perform the essential functions of [her] job," Pl.'s Opp'n Ex. G, and because the email she sent Manor

discussing her leave explained that she had "been under a psychiatrist's care for the past 6 years due to job related stress and anxiety," Def.'s Mem. Supp. MSJL Ex. 13.  Conn also asserts that "[t]he Red Cross possessed" a statement by Conn's former psychiatrist, Dr. Yason, indicating that Conn suffered from depression and anxiety, Pl.'s Opp'n 36 n.20, although Manor evidently did not see the physician's statement until after Conn had been terminated, see Def.'s Reply 24.

Although "an employer cannot be liable under the ADA for firing an employee when it *indisputably* had no knowledge of the disability," Hedberg, 47 F.3d at 932 (emphasis added), that is not the case here.  At the time Manor decided to terminate Conn, he was aware that she had been and continued to be treated by a psychiatrist over a period of years for anxiety issues and knew that whatever mental impairment she suffered from qualified as a serious health condition.  He also was aware, from the email Conn sent him after receiving the final written warning letter, that she was "heavily medicated and not able to travel or work."  Def.'s Mem. Supp. MSJL Ex. 13.  This evidence might not suffice to show that Manor knew that Conn suffered from depression in particular, but it could allow for the inference that Manor knew that Conn suffered from *some* serious mental impairment that would substantially limit a major life activity—an impairment that would therefore qualify as a disability under the ADA.  Therefore, even though questions remain whether Manor knew that Conn was disabled—if in fact she was—viewing the facts in the light most favorable to Conn, a reasonable jury could conclude that he did.

### c.   Evidence of Disability Discrimination

Assuming that Conn was disabled and Manor was aware of her disability, Conn still must produce sufficient evidence for a reasonable jury to find that the Red Cross intentionally discriminated against her based on her disability.  Conn contends that she has produced sufficient evidence to support a finding of disability discrimination.  According to Conn, Manor told Dimmick that, after Conn returned from leave, he didn't want her working on her prior assignments

19

"because [she] would slow [them] down," Def.'s MSJL Ex. 1, at 33:15-22; see also Pl.'s Opp'n

Def.'s MSJL 36.  Additionally, Conn asserts that when she came back from medical leave, Manor

"had removed almost everything that defined [her] job as far as its responsibilities and level [she]

was working at." Id. at 53:12-15; see also Pl.'s Opp'n Def.'s MSJL 36.

As with Conn's age-discrimination claim, the Court agrees that the comment that Conn

"would slow us down" if given back her former assignments may well have been innocuous, as the

Red Cross claims.  Then again, it could also reflect "the sort of 'inaccurate and stigmatizing

stereotypes' that led Congress to enact the" ADA.  Wilson, 753 F.3d at 247–48 (quoting Hazen

Paper Co., 507 U.S. at 610.  That is, a reasonable factfinder could conclude from the statement

Manor made, in relation to when he potentially received notice of Conn's alleged disability, that

Manor viewed workers with mental impairments like Conn's to be inefficient and allowed this view

to motivate his decision to terminate her.  That, when viewed in the light most favorable to Conn,

can be enough to permit an inference of disability-based bias.  Similarly, if Manor was indeed made

aware of Conn's disability, the fact that he very shortly thereafter removed her job

responsibilities—following her doctor's approval to return to work from medical leave—could

further allow a reasonable factfinder to conclude that Conn was terminated on the basis of her

disability.  This is true—whether considered under a motivating-factor or but-for causation

standard—especially in light of the evidence Conn has produced calling into question whether the

Red Cross's reasons for terminating her were the true reasons for taking the action it did.

Accordingly, the Court will deny the Red Cross summary judgment as to Conn's ADA claim.

4.    District of Columbia Human Rights Act

The DCHRA prohibits age and disability discrimination in employment along the same

lines as the ADEA and ADA.  The Red Cross contends that Conn cannot pursue claims under the

DCHRA, however, because "the DCHRA does not apply extraterritorially and Conn's claims do not

have a sufficient link to the District of Columbia." Def.'s Mem. Supp. MSJL 35. The Red Cross is correct. "The DCHRA is not extraterritorial; it does not and cannot secure an end to discrimination in jurisdictions outside of the District of Columbia." Cole v. Boeing Co., 845 F. Supp. 2d 277, 284 (D.D.C. 2012). Neither party disputes the DCHRA's lack of extraterritoriality, but they sharply disagree as to whether this case involves an extraterritorial application of the act.

In support of its position that the act does not apply, the Red Cross underscores that Conn was not employed in the Red Cross's D.C. office, that there is no evidence in the record contradicting Manor's sworn statement that he was in Minnesota when he decided to terminate Conn (who telecommuted), and that Conn was in Florida when she was terminated and has resided there ever since. Def.'s Reply Supp. MSJL 36. Conn responds "that the Red Cross, not Mr. Manor, terminated Ms. Conn, and the termination letter came from the District of Columbia." Pl.'s Opp'n Def.'s MSJL 37. Under District of Columbia Court of Appeals precedent, however, "[i]t would not be enough to establish subject matter jurisdiction under the DCHRA simply to show that the company is headquartered here or has offices here," Monteilh v. AFSCME, 982 A.2d 301, 304–05 (D.C. 2009), as is true for the Red Cross. Rather, for the DCHRA to apply, "[e]ither the *decision* must be made, or its *effects* must be felt, or both must have occurred, in the District of Columbia." Id. at 305 (emphasis added). Here, Conn does not attempt to show that any effects of the alleged discrimination against her were felt in the District, and it is undisputed that Manor, the only person whom Conn alleges discriminated against her due to her age or disability and who at all relevant times worked in Minnesota, made the allegedly discriminatory decision to terminate her outside of the District. As a result, the DCHRA does not apply to Conn's claim of discrimination, and the

Court will therefore grant summary judgment for the Red Cross on Counts Three and Four of the Complaint.

### B.    Motion for Partial Summary Judgment on Damages

The Red Cross also moves the Court to enter summary judgment against Conn with respect to certain categories of damages that she seeks: (1) salary- and benefits-related damages, on the ground that Conn failed to mitigate her damages, and because most of the salary- and benefits-related damages Conn seeks are not recoverable for additional reasons; (2) punitive damages under the ADA and liquidated damages under the ADEA, because the Red Cross is immune from such damages as a federal instrumentality; (3) compensatory and punitive damages under the ADEA, because such damages are unavailable under that statute; and (4) living expenses, because Conn would have incurred the same expenses even if she had not been terminated.  Def.'s Mot. Partial Summ. J. Damages ("MPSJD") 1.  The Court will address the first, third, and fourth issues, and defer ruling on the second.

### 1.    Mitigation of Damages

Conn seeks damages to compensate her for the loss of salary and related benefits after her termination.  In order to recover these "back pay" damages, plaintiffs in discrimination cases must make good-faith efforts to mitigate their losses by seeking other, suitable employment.   According to the Red Cross, the evidence establishes that Conn did not conduct her post-termination job search with the required good faith.  In the alternative, the Red Cross urges the Court to cap Conn's back-pay damages because Conn acknowledged in her deposition that she voluntarily abandoned her search altogether some eight months after she was terminated.  Conn defends the adequacy of her job search, claims she continued to search for work after eight months (notwithstanding her deposition testimony to the contrary) and that further searching would have been fruitless, and

argues that the Red Cross has not established that comparable jobs were available to her.  The Court will address the last of Conn's arguments before proceeding to the first two.

a.   The Availability of Substantially Equivalent Employment

The Red Cross has raised Conn's alleged failure to mitigate damages as an affirmative defense.  Conn responds that, to establish the defense, the Red Cross must prove not only that she failed to conduct a good-faith search, but also that suitable employment existed in the form of jobs similar to that from which she was terminated.  Pl.'s Opp'n Def.'s MPSJD 2–3.  Conn is able to muster two opinions from this Court adopting her proposed standard.  See Griffin v. Wash. Convention Ctr., No. Civ. 93-2297 (JMF), 2000 WL 1174967, at *2 (D.D.C. July 21, 2000) ("[T]he presumption in favor of back pay can be overcome only by the defendant showing that there was substantially equivalent employment available *and* that the plaintiff failed to search for it in a meaningful way and accept it once found." (emphasis added)); Borgo v. Goldin, Case No. 95-155 (RCL), 1998 U.S. Dist. LEXIS 13847, *12–13 (same).  Yet the descriptions of the appropriate standard in those cases cannot be squared with the D.C. Circuit's.  In NLRB v. Madison Courier, Inc., the D.C. Circuit explained that where a plaintiff has failed to diligently exercise good-faith efforts to find a new job, "a scarcity of work and the possibility that none would have been found even with the use diligence [are] *irrelevant*."  472 F.2d 1307, 1318 (D.C. Cir. 1972) (emphasis added).  This conforms to the prevailing view among the circuits.  See Wagner v. Dillard Dep't Stores, Inc., 17 F. App'x 141, 153–54 (4th Cir. 2001) ("Although an employer *ordinarily* must come forward with evidence that comparable work is available, that is not the case if the plaintiff makes little or no effort to seek employment.") (emphasis added); Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 54 (2d Cir. 1998); Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1527 (11th Cir. 1991); Sellers v. Delgado Cmty. Coll., 839 F.2d 1132, 1139 (5th Cir. 1988); see also Quint v. A.E. Staley Mfg. Co., 172 F.3d 1, 16 (1st Cir. 1999) (recognizing a similar exception where "it has

23

been shown that the former employee made *no* effort to secure suitable employment" (emphasis added)).  But see Odima v. Westin Tucson Hotel, 53 F.3d 1484, 1497 (9th Cir. 1995) (rejecting an exception to the rule).  Accordingly, if the Red Cross can establish that Conn did not conduct a good-faith job search, it need not also present evidence on the availability of suitable alternative employment in order to successfully advance its affirmative defense that Conn failed to mitigate damages.

### b.  The Adequacy of Conn's Job Search

The parties dispute whether Conn made an honest effort to find a new job after she was terminated in January 2012.  Conn testified in her deposition that she sent out some 140 copies of her resume, about five per week, to prospective employers.  Pl.'s Opp'n Def.'s MPSJD 3.  While the Red Cross does not contest that Conn applied for jobs, it questions whether she was truly serious about obtaining substitute employment.  Citing Conn's own deposition testimony, it claims that "the only reason she looked for a job at all was to fulfill the minimum requirement for receiving employment benefits."  Def.'s Reply Supp. MSJD 5.  The relevant testimony, however, fails to prove the Red Cross's point.  Conn was asked why she "stop[ped] looking" for employment. Id. at 3.  She responded that she had sent out five resumes per week because that many were required "to get unemployment benefits" and that she ultimately stopped looking after she "decided [she] didn't want to go back to work because there wasn't anything in [her] area." Id. Viewing the testimony in the light most favorable to Conn, her reference to unemployment benefits could well have been meant to explain the *number* of resumes she sent, rather than her motivation for conducting any search at all.  Moreover, the part of Conn's answer that was actually responsive to the question suggests that she ceased her search because she could not find any appropriate jobs in her field—hardly an admission that her search was not in good faith.

More troubling for Conn is her acknowledgement that she withdrew from consideration from the one position for which she was offered an interview because she was "too embarrass[ed]" to provide references or tell the potential employer that she had been terminated. Id. at 8.  As the Red Cross notes, Conn's hesitance to provide references or even discuss routine information about her former employment suggests that she may have been merely going through the motions of finding a job.  On the other hand, the interview offer in question was made in 2013, well after Conn acknowledges having given up actively searching for employment.  A reasonable juror might conclude that she failed to follow through with the interview because she had sensibly stopped her search months before.  That same reasonable juror could also conclude that Conn's overall efforts—including sending out some 140 resumes and posting to job-search websites—reflected a good-faith attempt to secure alternative employment.  Given the inherently subjective nature of the "good faith" inquiry, the Court will leave it to a jury to decide whether Conn gave it the old college try.

### c.  Conn's Abandonment of Her Job Search

As an alternative to denying Conn all back-pay damages, the Red Cross asks the Court to limit her damages to the eight-month period following Conn's termination during which she claims she was actively seeking alternative employment.  In her deposition, Conn unequivocally stated that she stopped looking for employment in September 2012.  The Red Cross argues that this concession forecloses an award of pay for the period after September 2012 because "[a] plaintiff may not simply abandon [her] job search and continue to recover back pay."  West v. Nabors Drilling USA, Inc., 330 F.3d 379, 393 (5th Cir. 2003).  Conn's response is two-fold.  Citing her own affidavit—which she claims to have prepared in order to "clarify" her prior deposition testimony—Conn first contends that she did not completely abandon her job search after September 2012.  It was just "not as intensive and more selective."  Pl.'s Opp'n Ex. A (Decl. of Cathy E. Conn) ¶ 6.  The Court will not credit Conn's belated attestation on this point.  The so-called "sham affidavit" rule "precludes a

party from creating an issue of material fact by contradicting prior sworn testimony." Galvin v. Eli Lilly & Co., 488 F.3d 1026, 1030 (D.C. Cir. 2007). The rule applies here because Conn has not offered a persuasive explanation for why her subsequent statement is more accurate or why it constitutes a "clarification" rather than a contradiction of her deposition testimony. Id.

Conn next contends that to the extent she did curtail her search in September 2012, she did so because the search had become futile. This argument fares better. As noted above, Conn testified in her deposition that after eight months of searching, it was apparent that "there wasn't anything in my area" in terms of suitable employment. Def.'s Reply Supp. MPSJD 3. This testimony, along with the fact that Conn sent out around 140 resumes to no avail, could lead a reasonable juror to conclude that Conn was justified in abandoning her search after eight months of diligent effort. Cf. Killian v. Yorozu Auto. Tenn., Inc., 454 F.3d 549, 557 (6th Cir. 2006) ("[Plaintiff] was unemployed for eight months before entering cosmetology school. It cannot be said that she removed herself from the job market prematurely, and we cannot fault her for embarking upon a new career when there were no comparable positions available in her old one.").

Accordingly, because a genuine dispute of fact exists as to whether Conn made reasonable, good-faith efforts to find substitute employment before September 2012, and whether further searching after that point would have been futile, the Court will deny the Red Cross's summary-judgment motion as to whether Conn fulfilled her duty to mitigate damages. While the Red Cross will have ample evidence from which to argue that she did not, the question is ultimately one for the eventual factfinder to decide.

### 2.     Other Salary- and Benefits-Related Damages

The Red Cross also contends that most of the other salary- and benefits-related damages Conn seeks are not recoverable for additional reasons. First, it claims that any award of back-pay Conn receives should be offset by the $226 she earned from an art business she owns and the

$33,184 she collected in unemployment-insurance benefits during 2012.  Def.'s Mem. Supp.

MPSJD 7.  Conn concedes that any back-pay award should be reduced by any income she earned

from her art business, but disputes that any award should also be reduced by her unemployment-

insurance benefits.  Pl.'s Opp'n Def.'s MPSJD 10.  Of particular relevance in this dispute is the

collateral-source principle, which "states that benefits from a collateral source should not lessen

recoverable damages."  Neal v. D.C. Dep't of Corr., No. CIV. A. 93-2420 (RCL), 1995 WL

517249, at *7 (D.D.C. Aug. 9, 1995).

Multiple judges in this district have taken the view that "the collateral source principle,

properly applied, suggests that unemployment benefits should *not* be subtracted" from back-pay in

employment discrimination cases.  Id. (emphasis added).  In Neal v. D.C. Department of

Corrections, for example, Judge Hogan confronted the identical issue with which this Court is now

faced and held:

> [U]nemployment benefits do not represent multiple recovery for injuries inflicted
> upon the plaintiffs by the Department of Corrections.  Instead, these benefits are
> remuneration under a separate contract with the government, financed by payroll taxes
> and payable whether or not an employer is culpable . . . .  Plaintiffs are separately
> entitled to back pay and to unemployment benefits.  The former is compensation for
> the wrong they have suffered.  The latter is an obligation incurred by the government
> under a distinct and unrelated statutory regimen.  Payment of unemployment benefits
> is not punitive; it is mandatory, and entirely independent of defendants' transgressions.
>
> Collateral benefits should be deducted, if at all, only when they are gratuitous (e.g.,
> free medical care received by the plaintiff from a friend or relative, with no expectation
> of repayment in any manner).  Gratuitous benefits must be distinguished from
> collateral receipts arising from sources like an insurance contract, where consideration
> pursuant to a separate bargained arrangement was exchanged by the plaintiff in the
> form of policy premiums.  Unemployment benefits are analogous to insurance.  The
> plaintiff ultimately pays for the benefits—if not by policy premiums, then by lower
> wages to offset employer payroll taxes.  Logically, it makes no difference whether the
> insurer is the defendant or an independent third party.

Id. at * 7.  And Judge Friedman adopted the same reasoning in Phuong v. Nas, "conclud[ing] that

unemployment insurance benefits should not be subtracted from plaintiff's [back-pay] award" in an

ADEA case.  927 F. Supp. 487, 492–93 (D.D.C. 1996).  But see Bishop v. Jelleff Assocs., 398 F.

Supp. 579, 597 (D.D.C. 1974) ("Back pay is measured by the difference between the salary an

employee would have received but for a violation of the [ADEA] and the salary actually received

from other employment, *less unemployment benefits*." (emphasis added)).  As compared to the Red

Cross's position, these decisions are also more compatible with the Supreme Court's opinion in

NLRB v. Gullett Gin Co., which explained that "declin[ing] to deduct state unemployment

compensation benefits in computing back pay is not to make the employees more than whole . . . .

[M]anifestly no consideration need be given to collateral benefits [like these] which employees may

have received."  340 U.S. 361, 364 (1951) (deciding a case under the National Labor Relations Act,

on which the back-pay provisions of other employment-discrimination statutes are modeled).

 None of this is to say that courts may not employ offsets in certain situations to "provide a

way to prevent windfall recoveries."  Swanks v. Wash. Metro. Area Transit Auth., 116 F.3d 582,

587 (D.C. Cir. 1997).  At most, however, courts "retain[] the *discretion* under the ADEA to deduct

[unemployment-insurance] compensation from the back pay award."  Naton v. Bank of Cal., 649

F.2d 691, 700 (9th Cir. 1981) (emphasis added).  No hard and fast rule requires them to do so.  As a

result, the Court will deny the Red Cross's motion for summary judgment as to the unemployment-

insurance benefits that Conn may have received.

 Additionally, the Red Cross contends that Conn cannot recover pension benefits she claims

would have accrued after the Red Cross's retirement system closed on December 31, 2012, lost

interest income on her 401(k) contributions, or her life-insurance benefits in the form of the total

amount payable under the policy in the event of her death.  Def.'s Mem. Supp. MPSJD 8–10.  Conn

now concedes that she cannot recover retirement or pension benefits beyond December 31, 2012,

and that she cannot recover any life-insurance benefits.  Pl.'s Opp'n Def.'s MPSJD 10 n.14.  The

remaining dispute, then, is over whether Conn may recover lost interest on her 401(k) contributions

without an evidentiary foundation for her assertion that she would have earned interest at an annual rate of 7%. Whereas the Red Cross argues that market interest-rate projections require expert testimony (and Conn has not identified an expert), Def.'s Mem. Supp. MPSJD 8–9, Conn responds that she is at least competent to testify as to the interest rate through the end of 2012, Pl.'s Opp'n Def.'s MPSJD 10 n.14. In either event, the Court agrees with the Red Cross that Conn "has conceded her claim for lost interest income post-dating 2012," Def.'s Reply Supp. MPSJD 11, and Conn has cited no evidence at all to support her claim that her 2012 contributions would have grown at a rate of 7%. The Court will therefore grant the Red Cross's motion for summary judgment as to Conn's claims for post-2012 pension benefits, lost interest income, and life-insurance benefits.

### 3.    Compensatory and Punitive Damages Under the ADEA

The Red Cross contends that punitive damages and compensatory damages—that is, damages for pain and suffering or emotional distress—are never available under the ADEA. Def.'s MPSJD 16. Conn concedes in her opposition that she cannot recover compensatory or punitive damages under the ADEA. Pl.'s Opp'n Def.'s MPSJD 2. In light of this concession, and because persuasive case law, see, e.g., Lindsey v. District of Columbia, 810 F. Supp. 2d 189, 201 (D.D.C. 2011), and the text of the statute make clear that such damages are unavailable, the Court will grant the Red Cross summary judgment on Conn's demand for compensatory and punitive damages under the ADEA.

### 4.    Living Expenses

Conn also seeks $220,000 in damages as a result of her need to withdraw funds from her 401(k) to pay "[l]iving expenses" she incurred after she was terminated from the Red Cross. These expenses included "mortgage payments, home equity loan payments, automobile payments, credit card payments, taxes, home repairs and improvements, medical expenses, [and] food and clothing,"

as well as "tuition and housing assistance to [her] niece." Def.'s Mem. Supp. MPSJD Ex. 1 (Pl.'s Suppl. Response Def.'s First Set Interrogs.). As the Red Cross points out, however, "Conn seeks reimbursement for such expenses *in addition to*—not in lieu of—an award of back-pay for the period of time between her termination and trial." Def.'s Mem. Supp. MPSJD 17 (emphasis added). Conn incurred none of these expenses *as a result of* her allegedly unlawful termination; she would have faced all these same expenses regardless of whether she was terminated or not. Allowing Conn to recover damages to cover the cost of her living expenses—in addition to recovering back-pay—would obviously provide Conn with a windfall recovery. Such relief is unavailable under any of the statutes pursuant to which Conn brings her claims. The Court will therefore grant summary judgment in favor of the Red Cross as to Conn's attempt to recover her living expenses in addition to an award of back-pay.

### IV.     Conclusion

For the foregoing reasons, the Court will grant the Red Cross's motion for summary judgment on liability as to Conn's DCHRA claims (Counts Three and Four) but will deny it as to Conn's ADA and ADEA claims (Counts One and Two). The Court will also grant the Red Cross's motion for partial summary judgment as to certain salary- and benefits-related damages by denying Conn the opportunity to recover damages in the form of pension benefits she claims would have accrued after the retirement system closed on December 31, 2012, lost interest income, or life-insurance benefits; compensatory or punitive damages under the ADEA; and living expenses above and beyond an award of back-pay. The Court will also require that any back-pay Conn receives be reduced by the income she received from her art business. The Court will deny, however, the motion for partial summary judgment as to whether Conn mitigated damages and whether Conn's unemployment-insurance benefits must offset any back-pay award. Finally, the Court will defer

ruling as to the Red Cross's immunity from punitive damages under the ADA, liquidated damages

under the ADEA, and a jury trial under both statutes.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:   February 25, 2016